**AFFIRMED; Opinion Filed August 9, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01148-CR

### JASON MICHAEL LOWE, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-82169-2016**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Nowell

A jury convicted Jason Michael Lowe of murdering his girlfriend, Jessie Bardwell. He was sentenced to fifty years' confinement. In a single issue on appeal, appellant asserts the evidence is insufficient to support the conviction because (1) there is no physical evidence of causation; (2) there is insufficient evidence of intent and motive; and (3) the involvement of appellant's acquaintance mitigates his guilt. We affirm the trial court's judgment.

APPLICABLE LAW

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE. ANN. § 19.02(b)(1). A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly as to the nature

or circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist and he acts knowingly as to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. § 6.03(b).

When reviewing whether the evidence is legally sufficient to support a criminal conviction, we look at "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *See id.*; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (jury is the sole judge of credibility and weight to be attached to the testimony of witnesses); TEX. CODE CRIM. PROC. ANN. art. 38.04 (jury is the exclusive judge of the facts proved and weight given to the testimony). We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Murray*, 457 S.W.3d at 448. We are not permitted to use a "divide and conquer" strategy for evaluating sufficiency of the evidence because that approach does not consider the cumulative force of all the evidence. *Id*. When the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Id*. at 448–49.

Juries may draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *See Temple*, 390 S.W.3d at 360; *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007) ("courts of appeals should . . . determine whether the

necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict"). The jury is not permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *See Temple*, 390 S.W.3d at 360; *see also Hooper*, 214 S.W.3d at 16.

The State may prove a defendant's criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Temple*, 390 S.W.3d at 359 (quoting *Hooper*, 214 S.W.3d at 13). A jury may infer intent from circumstantial evidence, including the acts, words, and conduct of the accused. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *see Navarro v. State*, No. 05-17-01345-CR, No. 2018 WL 5291982, at \*4 (Tex. App.—Dallas Oct. 25, 2018, pet. ref'd) (mem. op., not designated for publication). Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations are probative of wrongful conduct and are circumstances indicative of guilt. *See Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014); *see also Nisbett v. State*, 552 S.W.3d 244, 266 (Tex. Crim. App. 2018) (inconsistencies in defendant's story provide evidentiary support for conviction). The defendant's prior behavior toward the deceased can be relevant to whether the defendant murdered the victim. *Nisbett*, 552 S.W.3d at 265-66. The Texas Court of Criminal Appeals recently stated:

> By its nature, a culpable mental state must generally be inferred from the circumstances. We cannot read an accused's mind, and absent a confession, we must infer his mental state from his "acts, words and conduct." The culpable mental state for murder can be inferred from a defendant's motive, his attempts to conceal the body, and implausible explanations to the police. The defendant's culpable mental state may also be inferred from the extent of the victim's injuries.

*Id.* at 267 (internal citations omitted).

Reversal on evidentiary sufficiency grounds is restricted to "the rare occurrence when a factfinder does not act rationally." *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *see Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (a reviewing court should not act as a "thirteenth juror"). The appellate scales are weighted in favor of upholding a trial court's judgment of conviction. *Winfrey v. State*, 323 S.W.3d 875, 879 (Tex. Crim. App. 2010).

To uphold appellant's conviction, this Court must conclude there is a sufficient basis upon which a rational jury could have concluded appellant intentionally or knowingly caused the death of Jessie Bardwell. *See* TEX. PENAL CODE. ANN. § 19.02(b)(1). It is uncontested Jessie died in early May 2016. The parties dispute whether the evidence is sufficient to show appellant caused her death with the requisite intent.

FACTUAL BACKGROUND

A. Jessie and Appellant's Relationship

At the end of December 2015, Jessie, who was 27-years old, broke up with her boyfriend. The following month, she moved from Alabama to Texas to live with appellant, her new boyfriend. Shortly after she moved, appellant became angry when he learned Jessie "hooked up" with a man on Christmas Eve and was pregnant; appellant believed Jessie cheated on him. Jessie called her father to tell him she had a fight with appellant, appellant "threw [her] out," and she wanted to return home. Although her father purchased a plane ticket for her, Jessie reunited with appellant later that day. Jessie had an abortion in February 2016.

On April 7, appellant texted Jessie: "it will take time for me to trust fully but I love you. For who you are. No matter what." One week later, he texted her: "Don't ever touch another guy[.]" On April 19, appellant texted: "I don't trust you. That's your fault[.]"

–4–

Jessie's father, Gary,[1] testified she always carried her cell phone with her before she moved to Texas. After she moved, she no longer did so. Jessie began using a prepaid cell phone, which Gary thought was "highly unusual" and unnecessary because he paid for her iPhone. Sometimes appellant answered Jessie's phone when Gary called and refused Gary's requests to speak to his daughter. Gary testified: "[appellant] would never let me call her on her cell phone." Appellant required Gary to call Jessie's prepaid phone and Gary believed appellant listened to their calls. Gary learned the text messages he sent to Jessie were routed through appellant's computer. Although Gary and Jessie previously enjoyed a "very close" relationship, they had less contact after she moved. He testified: "It was like she was a different person" and "[c]ommunications with her family, friends, anybody she had ever associated with were cut off completely."

Carla Bardwell spoke to her daughter every day before Jessie moved to Texas. After she moved, they only spoke once each week. In April 2016, Jessie told her mother she wanted to marry appellant; they applied for a marriage license in April.

### B. Appellant's Testimony about the Relationship

Appellant testified in his defense. Appellant met Jessie when she was dating appellant's friend, Ryan. Jessie and Ryan broke up on or about December 25, 2015. Jessie moved into appellant's apartment in Richardson, Texas, on January 1, 2016, and, shortly thereafter, appellant learned Jessie had sex with another man in December and was pregnant. He was angry and told Jessie to leave the apartment because he needed time to think. Jessie left, but returned after fewer than twenty-four hours. Appellant testified they "[w]ent back to normal," but he remained "upset about it . . . it's something that I don't think I ever really got over." Appellant told Jessie to take a taxi to get an abortion in early February. Although the abortion became a "point of contention afterwards" in their relationship, he explained it also was a bonding point that made them closer.

---

[1] Because Gary Bardwell has the same surname as the complainant and his former wife, Jessie's mother, we refer to him as Gary.

Appellant testified to experiencing jealousy and holding grudges against his girlfriends. He struggled to trust Jessie and believed she was cheating on him. However, while Jessie and appellant lived together, appellant used dating websites to flirt and engage in sexually explicit text messaging with other women. He stayed overnight with at least one woman, but explained "there wasn't anything physical." The record includes many conversations—some sexually explicit and containing graphic pictures—appellant had with women in the days before and after Jessie's death.

### C. Housesitting for Friends

Appellant and Jessie were friends with Thomas and Regina Jordan[2] who live in Corinth, Texas. The Jordans asked appellant and Jessie to housesit and care for their dog from May 1 to May 5 while they took a trip; appellant and Jessie agreed.

On April 30, 2016, appellant and Jessie drove separate cars to the Jordans' house: appellant drove his Infiniti sedan and Jessie drove his Audi SUV. In the evening, appellant and Thomas worked on a construction project for Thomas's business while Jessie remained at the house with Regina. Regina testified Jessie's "phone kept going off and she kept looking at it." Regina described Jessie's demeanor as "kinda sad." Jessie told Regina she was texting appellant who was mad at her "for something I did a long time ago and he can't get over it." Regina realized there was discord between the couple.

Phone records show the following text messages between Jessie's and appellant's phones on April 30: [3]

| Time | Initiating Phone | Receiving Phone | Message |
|---|---|---|---|
| 10:17 p.m. | Jessie | Appellant | Hey boo. What are yall doin? |
| 10:18 p.m. | Jessie | Appellant | I miss you |
| 10:22 p.m. | Jessie | Appellant | Regina and I have been sitting at the table talking and drinking wine |

---

[2] Because Thomas and Regina Jordan have the same surname, we refer to them by their first names.

[3] Typographical errors are original to the texts.

| 10:44 p.m. | Appellant | Jessie | Ok |
|---|---|---|---|
| 10:44 p.m. | Jessie | Appellant | What's wrong? |
| 10:53 p.m. | Jessie | Appellant | Love you |
| 10:57 p.m. | Appellant | Jessie | No you don't<br>I have to text you<br>I have to text just for you to talk b<br>Fuck this |
| 10:58 p.m. | Jessie | Appellant | I haven't texted anyone except you boo. I just got my phone out of the bedroom when you texted me. Regina and I have been talking for hours |
| 10:59 p.m. | Jessie | Appellant | Jason you can ask Regina. I thought you and Tommy were working and I didn't want to bother you |
| 11:00 p.m. | Jessie | Appellant | I love you Jason. And I am just trying to respect your space and time away so we can miss each other. |
| 11:02 p.m. | Jessie | Appellant | Do you want us to come get you? I would much rather be with you right now |
| 11:20 p.m. | Appellant | Jessie | Ok |
| 11:22 p.m. | Jessie | Appellant | You're my babe! And Little C[4] and I love you. |

Appellant and Jessie slept in the Jordans' spare bedroom the night of April 30. When the Jordans left the following morning, nothing appeared amiss. On May 4, the Jordans learned appellant and Jessie were not at their house, although they were supposed to housesit until May 5.

### D. Appellant's Testimony About Jessie's Death at the Jordans' house

While appellant and Jessie were at the Jordans' house, the Jordans asked if they would like to adopt the Jordans' dog. Appellant and Jessie were interested, but only after they moved into a house with a yard. In the interim, appellant thought his acquaintance from whom he frequently purchased drugs, Robert Guinn, might keep the dog because Guinn lived on a large property. On May 1, appellant asked Guinn to bring GHB and methamphetamines to the Jordans' house; they did not specify a time for Guinn's arrival. Appellant suggested Guinn could meet the Jordans' dog while he was there. Appellant testified he has an extensive history of drug use, and Jessie

---

[4] Appellant's dog's name was Caixa.

occasionally used drugs, including marijuana, GHB, and cocaine. Appellant estimated in March and April 2016, he and Jessie used GHB once a week.

After dinner on May 1, appellant and Jessie drank orange juice mixed with GHB before taking a shower together in the guest bathroom. The bathroom had a combination tub-shower with a shower curtain. While having sex in the shower, appellant slipped, which caused Jessie to slip and fall. Jessie's head struck the faucet and porcelain tub. She had a small cut on her head that stopped bleeding quickly and a bruise formed. She said she felt hot and dizzy. They dressed and then drank the remainder of the orange juice laced with GHB and got into bed together. Appellant fell asleep.

Appellant awoke when he heard a knock on the door and the dogs barking. Jessie was lying next to him. Appellant was confused that Jessie was still asleep and he "felt like something wasn't right." He shook Jessie, but she did not awaken. Jessie did not move when appellant got out of bed to answer the door. Guinn was at the door and appellant told him Jessie did not wake up. Seeing the concerned look on appellant's face, Guinn pushed appellant aside and went into the bedroom. Guinn shook Jessie, slapped her face, and yelled to wake her up. Guinn told appellant: "this is a mess, you know, we've gotta fix this."

Appellant paced in the bedroom while Guinn pulled a sheet from the linen closet. Appellant was scared because of the "drugs and everything," and Guinn was concerned because he supplied the drugs. Appellant let Guinn manage the situation; he testified: "I wasn't really thinking much. Once it was set in motion it was like I just went." Guinn wrapped Jessie's body in the sheet, and they placed it in appellant's Audi SUV. Guinn instructed appellant to follow him to his farm, but appellant drove to his apartment instead. Appellant left the body inside the SUV for several days.

–8–

E. **Jessie is Missing & Police Investigate**

In early May 2016, Jessie's father, Gary, was unable to contact her. He eventually called appellant who was aggravated and told him "let's not do the codependent thing," "Jessie is better off now than she ever was," and appellant "never heard of a family talking to each other every day." Gary never talked to Jessie in May 2016.

Jessie did not call her mother or step-mother on Mother's Day, which was May 8, 2016. Gary and Carla both testified it was unusual for Jessie not to call. When Carla called Jessie, appellant answered the phone and said Jessie was shopping. He led Carla to believe nothing was amiss.

*1. Welfare Checks*

After being unable to contact Jessie for several days, coupled with her failure to call on Mother's Day, Gary requested the Richardson Police Department ("RPD") conduct a welfare check. On May 8 at approximately 2:00 p.m., Sergeant James Holley of the RPD spoke to appellant who said Jessie left the apartment that morning to go shopping. Neither Jessie nor her vehicle was at the apartment.

Officer Adam Graham of the RPD conducted a second welfare check five hours later because Gary still could not contact his daughter. Appellant told Graham that Jessie left earlier in the day, was driving her car, an Acura SUV, and had not returned. Appellant said "they weren't codependent, they didn't keep tabs on each other; sometimes she would just leave for hours at a time and come back." Appellant appeared "[k]ind of scattered, nervous, talkative." Appellant permitted Graham to look inside the apartment, which had drug paraphernalia "all over the place" and smelled of marijuana. Jessie was not in the apartment.

Shortly after midnight on the morning of May 9, Graham returned to appellant's apartment after Gary requested another welfare check. Graham saw a small bag with two handguns in a truck

appellant rented that was parked outside appellant's garage; he later learned the guns were registered to appellant. Appellant did not answer when the police knocked on the apartment door.

At approximately 7:00 p.m. on May 9, Graham returned to appellant's apartment complex for the third time; Graham's sergeant joined him later. While the officers were at the complex, appellant arrived in his Audi SUV, which was covered in wet mud. His clothing also was muddy and he had small scratches on his hands and forearms. Appellant told Graham he was walking with his dog on a trail, the dog escaped, and he got muddy and scratched while chasing the dog. Graham thought the story was odd because the dog is small, only has three legs, and was "totally clean." Graham also noticed the Audi's bumper was "ripped completely off the vehicle and stored in the rear compartment." Appellant explained he took the Audi mudding, which Graham thought was unusual because "you don't take a $90,000 car for a joy ride like that on some property, and rip the bumper clean off and not care."

As the police continued talking to appellant, his story changed. Although he initially explained he recently went mudding, he later stated he went mudding two weeks prior. The mud was wet and just beginning to dry, and the Audi's interior smelled like wet lake mud. Appellant told Graham the bumper on the car broke, and he was scratched while removing it, which was inconsistent with his original explanation that the dog scratched him.

Appellant allowed the police to search the apartment and his vehicles where they found marijuana paraphernalia, muddy gloves, and muddy boots. Appellant told Graham he had not seen or heard from Jessie, she did not return home overnight, he was becoming worried about her, and he had been out all night looking for her.

Based on appellant's conflicting stories, Graham believed Jessie was in danger; a missing person's report was filed the evening of May 9, 2016.

2. *Muddy Black Audi*

Around noon on May 9,[5] Loren Cryer was driving in a rural area of Farmersville, Texas, when he noticed a black Audi parked on a property where Cryer previously saw people depositing salvage material. He saw a white, tall, slender man standing in front of the Audi; the man was not the property owner. Cryer had not seen the Audi before and it was not the type of vehicle typically on the property. The Audi was leaving when he passed the property again approximately forty-five minutes later. Cryer testified the Audi was driving fast and "slinging mud in the road. . . . I just thought that was awful strange he's in a real big hurry . . . and there's mud just trailing the car down the road, and he's throwing, you know, softball sized mud clots off the Audi." Cryer saw the front end "was kinda messed up." Following the Audi and noting erratic driving, he initially wondered if the driver was lost and then thought the vehicle could be stolen. Cryer wrote down the license plate number and, several days later, provided it to the police. The police later matched the plate to appellant's Audi.

### 3. Jessie's Acura

Detective Chiron Hale of the RPD called appellant on May 10. Appellant again said he last saw Jessie on May 8 at approximately 10:00 a.m. Appellant speculated Jessie drove her Acura to Klyde Warren Park or to go running or shopping.

Hale went to appellant's apartment the following day. Appellant recounted that Jessie moved in with him in January 2016, but she cheated on him in December 2015 and became pregnant. She got an abortion, they reconciled, and they were talking about getting married.

Using a license plate database that records GPS coordinates, time, and location, Hale located Jessie's Acura in Garland, Texas. When Hale went to the address, he found the Acura parked in the driveway. Joshua Lucke lived in the house and spoke to Hale.

---

[5] Cryer believed the date was May 9, but testified the date could have been May 10.

Lucke testified appellant asked Lucke if he was interested in buying the Acura in April 2016. Lucke and his wife went to appellant's apartment where Jessie showed the car to them. On April 19, appellant delivered the Acura to Lucke. Lucke gave appellant approximately $700 and appellant signed a handwritten "bill of sale," which states: "I Jason Michael Lowe received 500$ [sic] as a down payment for a 2006 Acura on 4/19/2016 from Joshua Lucke. I agree to a payment plan of 200$ [sic] a month until the total amount of [blank space] is paid off starting May 2016." Appellant printed and signed his name as the "seller/lienholder." Lucke did not sign the document. Jessie was not present and did not sign the document. Lucke and his wife testified they had continuous possession of the Acura from April 19 until the police confiscated it as part of the investigation.

### 4. Police Interview Appellant

Hale and Detective Pagel[6] returned to appellant's apartment on May 12. The officers asked appellant to talk to them at the police station. Appellant initially agreed if he could drive himself, but then said his keys were locked inside a truck he was renting. He did not explain why he could not drive his Audi SUV to the station. Instead appellant consented to an interview at his apartment. In the kitchen, the officers saw a white substance that appeared to be cocaine. When Hale asked whether Jessie also used drugs, appellant said she did not.

During the interview, Hale repeated many questions he asked before. Appellant's story about the mud on the Audi changed again; he told the officers he went fishing at Lake Lewisville on May 8 and the vehicle got muddy. Appellant again told the police he last saw Jessie on May 8 when she left the apartment in her Acura. When the officers informed appellant they knew Lucke purchased the Acura in April, appellant "stuttered," acted surprised, said he remembered leasing

---

[6] Pagel did not testify at trial and the detective's first name does not appear in the record.

the Acura to a man, and then stated there were multiple sets of keys and he and Jessie continued having access to and using the Acura after leasing it to Lucke.

Appellant allowed the officers to search his apartment, but initially did not consent to them searching the garage. Once he did so, crime scene personnel were summoned and went to the garage with Pagel while Hale stayed in the apartment with appellant. Pagel called Hale and said the garage smelled like a dead body. Hale later went to the garage as well; he testified that although the door was open, the garage "smelled like a dead body or decaying flesh," and the smell was not from a dead animal. Detective Eric Willadsen of the RPD noticed the smell of decaying flesh emanating from the garage when he arrived at appellant's apartment, and he thought Jessie's body might be inside the garage. When asked about the smell, appellant said it could be stale lake water or from trash he transported to the dump. Hale testified the odor was not lake water or trash. In the rear of the Audi, police found standing fluid that smelled "like decaying flesh" and tested positive for hemoglobin.

The police arrested appellant for possession of drugs on May 12. During his post-arrest interview, appellant maintained he last saw Jessie on May 8, and he did not know her location. When asked whether he made phone calls to try to locate Jessie, appellant said he had not; Hale thought it was strange that the woman appellant planned to marry had disappeared and he had not tried to locate her. Appellant stated he had not driven the Audi in ten days to two weeks, which contradicted his story about getting stuck in the mud at Lake Lewisville on May 8 and the fresh mud on the car that Officer Graham saw on May 9.

*5. Police Search Appellant's Apartment, Garage, Audi*

The police obtained search warrants for the apartment, garage, and Audi. They found cleaning products, Febreze, guns and ammunition, yellow latex gloves typically used for cleaning dishes, a shovel, and drug paraphernalia in the apartment and garage. Jessie's Texas ID card was on the master bedroom floor. In an unlocked book safe, police found three cell phones, including the pre-paid phone Jessie used. A floral-print overnight bag contained women's and men's clothing, including a red Warrior Dash t-shirt that appellant repeatedly told police Jessie was wearing when she left the apartment on May 8.

The Audi was muddy inside. The back of the Audi was wet and some parts had a red hue. The police found reddish-colored, odorous fluid in the compartment beneath the spare tire. Dark, brownish-red fluid was on the tailpipe. Crime scene investigators sprayed the inside of the car with Bluestar to detect the presence of bodily fluids and it indicated a positive reaction leading Willadsen to believe it was positive for blood.

Brian Altus, a criminalist in the crime scene unit at the RPD, participated in processing appellant's Audi on May 13, 2016. When Altus arrived at appellant's garage, he noticed an "odor of decomposition, human decomposition" that was the strongest in the Audi's "very damp" cargo area. Approximately one half inch of fluid was in the spare tire bay. Bluestar was sprayed in the cargo area of the Audi and it illuminated in several areas.

In August 2017, shortly before appellant's trial began, the police obtained a new warrant to search the Audi again. They found additional dried fluid inside the Audi's bumper and dried red fluid in multiple areas of the trunk compartment. Several areas tested positive for hemoglobin. Police found dead maggots and insect larvae in the car.

### F. Appellant's Erratic Behavior after Jessie's Death

Appellant exhibited odd behavior in the days following Jessie's disappearance. For example, appellant called Gary approximately 30 times on May 8. Each time Gary asked where Jessie was and appellant maintained he did not know. Also on May 8 at 9:40 p.m., appellant sent an email to Jessie. The subject line was "URGENT. CALL YOUR DAD." The body of the email states: Where are you??? I'm worried and your dad has sent the cops here twice looking for you. Please call him or come home asap. I love you baby girl." According to appellant's testimony, Jessie was dead on May 8.

Numerous text messages were exchanged between phones belonging to appellant, Jessie, and Jessie's parents between May 2 and May 9. Appellant admitted sending all the messages from his and Jessie's phones.[7]

| Date and Time | Initiating Phone | Receiving Phone | Message |
|---|---|---|---|
| May 2 @ 5:01p.m | Appellant | Jessie | Let's go to conns today.. Hope your interview went well |
| May 2 @ 5:52 p.m. | Jessie | Appellant | Sounds good boo i love you! |
| May 3 @ 12:19 p.m. | Appellant | Jessie | Hey boog I just got to the house.. Miss you. I love cuddling with you and when you're laying in my arms. |
| May 3 @ 12:20 p.m. | Appellant | Jessie | I told your dad that we would get the car there at some point. I just made a payment today so I'm in no hurry. |
| May 3 @ 2:02 p.m. | Jessie | Appellant | I love you Jason Michael! |
| May 4 @ 11:50 a.m. | Appellant | Jessie | You doin ok boo? Don't stress about the job it'll all be ok |
| May 4 @ 11:52 a.m. | Appellant | Jessie | You wanna go back to ms for Mother's Day? |
| May 4 @ 8:21 p.m. | Carla | Jessie | Did you get a job yet? |
| May 4 @ 8:16 p.m. | Appellant | Gary | It's looking like Jessie got the job at the apartment complex she wanted too. |
| May 4 @ 8:46 p.m. | Gary | Appellant | How are you and Jessie doing? |
| May 4 @ 8:47 p.m. | Appellant | Gary | Great. The job stuff is stressful but that's normal. But it's all coming together so it's |

---

[7] Typographical and spelling errors are original to the texts.

–15–

| | | | exciting. Never felt like this about anyone so it's new but a really good feeling. |
|---|---|---|---|
| May 4 @ 11:13 p.m. | Jessie | Carla | Love you mamacita! |
| May 4 @ 11:15 p.m. | Jessie | Carla | I should get the leasing consultant job i wanted is what lacey told Jason so fingers crossed! |
| May 5 @ 7:45 a.m. | Gary | Appellant | Jason have Jesse call me today please |
| May 5 @ 11:47 a.m. | Appellant | Jessie | Your dad is driving me nuts |
| May 5 @ 11:48 a.m. | Appellant | Jessie | Like didn't we talk about it with him? Shit |
| May 5 @ 2:53 p.m. | Gary | Appellant | Jason, Where is Jessie? |
| May 5 @ 3:12 p.m. | Appellant | Gary | Please do not start this again. I thought we were past this. I'm not falling back into that with you. Please don't make me block or change my number. I will not argue with you so please just chill out like we all talked about just over a month ago. This was the type of behavior that you have had to apologize for so please stop. You cannot make people like you or love you. Not family or anyone. I'm sorry but I'm not going to do what I said I wouldn't do - - and that's get sucked back into this toxic type of dynamic and play the middle man. If you continue to do this and cause Jessie stress, I will change my number and address. We talked about all of this in your living room. All 4 of us. Nothing has changed, nor will it. |
| May 5 @ 3:16 p.m. | Gary | Appellant | I'm not trying to start trouble Jason. I just want to talk to Jessie. I talked to you yesterday so I would like to talk to Jessie. |
| May 5 @ 3:27 p.m. | Gary | Appellant | Ok, never mind. I'm sorry t bothered you. |
| May 7 @ 4:40 p.m. | Gary | Appellant | Jason, I've only helped Jessie and you. I don't know what you've said or done to make Jessie not want to talk to me. If I don't hear her voice by Sunday, I'm coming to Dallas Wednesday. |
| May 8 @ 9:34 a.m. | Gary | Appellant | Have Jessie call me today after lunch. |
| May 9: multiple messages | Gary | Appellant | Jason, Go find Jessie and have her call me. I want The next person to call me to be Jessie. . . . Jason, You know this doesn't make any since. If Jessie was ok she would've found a cell phone and called me or her mother. Get off your ass and find her and have her call me tonight. . . . |

| | | | Jason did you hurt Jessie and put her on the street in Dallas with no money or car? If you did, you are going to be in a world of trouble.<br>. . .<br>Where is Jessie?  Son, I need to know. |
|---|---|---|---|

## G. Appellant's Testimony about the Days Following Jessie's Death

Appellant testified he left Jessie's body in the trunk of his Audi SUV, including when he drove the vehicle.  When he was at home with the Audi in his garage, appellant often sat in the SUV and talked to Jessie because he missed her.  Appellant felt his mind was "fractured," he did not accept her death, and he sometimes thought she was asleep.  When asked why he emailed Jessie on May 8 that she urgently needed to call her father even though he knew she was dead, appellant testified: "Same reason I would go down there and talk to her. . . I just wanted everything to be okay."  He wanted to believe she was still alive.  In the days after Jessie's death, he used more GHB, cocaine, and marijuana to avoid the truth.  Appellant explained that sending the text messages between his phone and Jessie's was a way for him to keep Jessie alive in his mind; the messages were not intended to deceive anyone.  Appellant conceded he also made phone calls between his phone and Jessie's phone with each phone initiating some of the calls, which was another way for him to pretend she was still alive; he testified: "it was the only way I could hold on to everything . . . It's all that made sense to me."  He considered it a private reality he had with Jessie, and he was trying to maintain it.

Appellant recalled being contacted by Gary and Carla Bardwell and giving them the impression Jessie was alive and everything was fine because that was how he "wanted it to be."  He lied to Jessie's parents.

He conceded he also lied to the police when he told them Jessie left the apartment in her Acura on May 8.  When asked why he did not tell the first officer who executed a welfare check

that Jessie was dead, he said he panicked and "chose the wrong thing" again. After the police initially searched his house and garage and did not find the body, he had "a real lucid moment" and realized "this is gonna be really bad if they just find her back there." He drove the body to Guinn's property where the Audi became stuck in mud. Guinn had chains to pull the Audi out of the mud, but, because appellant did not attach them correctly, the bumper was torn off. Eventually they pulled the Audi out of the mud and drove to the back of the property.

Guinn tied a red ratchet strap around the torso of the body, but appellant did not know whether Guinn took the straps from the Jordans. They placed the body in the woods. Appellant removed the Audi's cargo mat because it had Jessie's bodily fluids on it. The blue sheet, cargo mat, and ratchet strap were the only items covering the body when appellant left the property.

When appellant arrived home, two officers were at his apartment. He again lied to the police about Jessie leaving the apartment on May 8 driving her Acura.

**H. Jessie's Body Recovered**

On May 19, appellant and his lawyer executed an agreement with the district attorney's office stating:

> Jason Michael Lowe agrees to lead law enforcement officers to the last known location of the body of Jessie Merle Bardwell. . . . if law enforcement officers recover the body of Jessie Merle Bardwell at the location identified by Jason Michael Lowe, the State agrees that any punishment assessed for any offense committed by Jason Michael Lowe that caused the death of Jessie Merle Bardwell will not exceed 50 years' confinement.

Jessie's body was located that day on Guinn's land in Farmersville.

Diana Strain, a special agent with the Federal Bureau of Investigation, assisted the RPD with recovering the body. She observed deep tire tracks in the mud as though a vehicle had been stuck. The area smelled of a decomposing body. Jessie's body was wrapped in a blue fitted sheet secured with a red tow strap. Strain testified the body was "covered well" with bubble wrap, a cargo mat, trash bags, a piece of tin, and branches. The cargo mat belonged to a 2010 Audi Q5,

the model appellant owned, and it fit in the back of appellant's Audi. Audi molds rear cargo covers to fit specific Audi model cars. Police discovered other car parts with part numbers nearby on the ground; they all belonged to a 2010 Audi Q5.

The FBI also found plastic gloves, a brown towel, a red blanket, and ratchet straps inside a trash bag. Regina Jordan testified the sheet, towels, and blanket found at the crime scene belonged to her; she stored them near the spare bedroom where Jessie and appellant slept. When shown a picture of the ratchet straps found near Jessie's body, Thomas Jordan testified they looked the same as the ones he owned. Thomas testified he has straps "[a]ll over my garage. I have them in a 5-gallon bucket, and then I had some in a box that was emptied out."

Dr. Lynn Salzberger, a medical examiner,[8] testified the body was wrapped in a fitted dark blue sheet and tied with a flat red strap. The sheet was damp with decomposition fluid. Describing the body, Salzberger testified:

> She was severely decomposed. Her face and the front of her neck were essentially skeletonized. When you looked at the front of her body, all -- you could just see her back bone. There was no soft tissue, no vessels, no muscles; nothing but bone when you looked at her neck from the front. And her face was also technically skeletonized. Her head was really held on her body just by a strap of skin that was in the back of her neck. She had other defects on her abdomen, the right side of her abdomen there were some defects. And on both arms there were some defects. Difficult to tell whether the defects were caused by trauma or caused by animal or insect activity. Also the external examination was remarkable for the number of maggots that were present on her body. I honestly had never seen as many maggots as I had seen in this case.

Salzberger further explained: "whenever I see an area of tissue that's missing, like the neck, I always worry that there's an underlying injury. And that's because maggots and animals like to go to areas where it's easy to get into the body and get into the organs because they prefer that over the skin." The State showed photographs of Jessie's skeletonized body to the jury.

---

[8] Salzberger testified she was retired at the time of trial.

The ground beneath the body was covered with maggots and bodily fluid. Based on the size and life-stage of the maggots, Salzberger estimated the body was on Guinn's property for approximately ten days.

Salzberger examined Jessie's body on May 20. She obtained medical records from Jessie's doctor, which indicated Jessie was a healthy 27-year-old woman without any on-going medical problems. Although she could not determine the exact time of death, based on the level of decomposition, she estimated it may have been as early as May 1. All organs except the heart were "liquefied and completely unrecognizable" and could not be examined. Salzberger did not find evidence of broken bones. The toxicology report was negative for alcohol, prescription medication, and common illicit drugs. Jessie's dental records were used to identify the body.

In response to questions from the defense, Salzberger testified she was not asked to have Jessie's tissue tested for the drug GHB and did not order that testing. Salzberger explained that when someone takes GHB and dies shortly thereafter, the drug remains in the body's tissue. Usually, if a person dies from a drug overdose, the drug can be detected in the body regardless of when the body is found. Appellant conceded he did not inform the police about Jessie's use of GHB until he testified at trial. He acknowledged that telling the police about the GHB could have allowed the medical examiner to corroborate his story, but insisted he did not know Jessie's tissue would not be tested for GHB as part of the autopsy.

Also in response from question from the defense, Salzberger testified a subdural hematoma in a person under the age of forty or fifty is "a result of severe, significant, blunt force trauma, with a lot of force." For example, the following events could cause a subdural hematoma: a high-velocity motor vehicle accident, a pedestrian struck by a car who flies into the air and lands on his head, or a hard punch in a fight that results in a person landing on a hard surface with a heavy impact. If a young person has a subdural hematoma, Salzberger expects to see significant blood

loss along with tears in the scalp or face. She testified the amount of bleeding "would be alarming to most people." The event causing such an injury could also cause a concussion and the person would be unconscious or unresponsive. If a person's forehead struck porcelain in a way to cause a subdural hematoma, Salzberger would expect the impact to be so severe that there would be a bruise, a gash, and blood. However, a person could suffer a subdural hematoma, remain conscious, and die several hours later; the person might report feeling dizzy. A person could have a subdural hematoma if she were pushed "extremely hard."

Salzberger testified nothing about the state of Jessie's body was consistent with a natural death, but she could not determine a cause of death. Salzberger believed Jessie died of homicidal violence because Jessie disappeared under suspicious circumstances; her parents were unable to contact her, which was unusual; appellant acted strangely; human blood was identified on appellant's car; and someone went to "very great lengths" to conceal the body at a remote, inconvenient location. She testified: "Clearly whoever did this to her did not want her to be found ever."

### I. Appellant's Conversation in Jail

Thomas Jordan visited appellant in jail. The jury watched a redacted video of their conversation, which includes the following statements:

| | |
|---|---|
| Appellant: | I fucked up and made a mistake. Like, it was an accident. . . . I know what I'm guilty of. I'm guilty of criminal negligence. |
| Appellant: | I made my bed, you know, and it was just - - I have a bad habit of being in the wrong place at the wrong time and picking the wrong people to be around. |
| Thomas: | Accidents happen. But, you should have called me before the accident ever happened. And if there's an issue…. |
| Appellant: | Dude, you know, that's the thing - - it was all so quick that I just - - I did have time after the fact, but then it was too late. You know? I mean I thought I'd have another 24 hours and, like, this would have gone way different. Like, way different. |

| Thomas: | You're a man. You got to stand up for what you did and take the punishment like a man and be good about this. |
|---|---|
| Appellant: | Yeah, no. I'm going to. That was the plan all along. . . . I had to do it the right way. The only way to do it the right way and safely was the way I did it, unfortunately. And her fucking dad is the one pushing my hand on that. |
| Thomas: | . . . nothing happened at my house, correct? |
| Appellant: | I can't make that promise. . . . nothing like of any substance happened there. So you don't have to worry about that. But, it's very minimal. |
| Thomas: | Jason, if you were having issues and upset, you should have called me before you ever laid a hand on that girl. |
| Appellant: | No, I wasn't having issues and upset. That's not how it went. . . . If I'd wanted, I would have. Like I had in the past. I mean, this was literally like a split second, like, what the fuck. |
| Thomas: | I just wish before everything went down and, you know, you ruined her life you ruined your life that you would have called me, man, where we could have talked about it and have got you through whatever her problem was. |

In his testimony, appellant denied knowingly or intentionally causing Jessie's death or intending to kill her and then doing so.

ANALYSIS

The uncontested evidence shows Jessie died in early May 2016 of an unnatural cause, appellant was the last person to see her alive, appellant was with her when she died, appellant concealed her body in the back of the Audi for several days, appellant lied to the police and Jessie's family about her whereabouts, appellant created text conversations using Jessie's phone after she died, appellant deposited Jessie's body on Guinn's land, and the body was recovered with appellant's assistance after he entered into an agreement with the State to limit any punishment he might face for any crime he may have committed. The parties disagree about whether the evidence, viewed together in the light most favorable to the prosecution, is sufficient to show appellant knowingly or intentionally caused her death.

In *Nisbett v. State*, 552 S.W.3d 244 (Tex. Crim. App. 2018), the Texas Court of Criminal Appeals considered facts similar to those now before this Court. *Nisbett* resolved appeals from

two men convicted of murdering their wives. Although factually unrelated, the cases were similar because, in each case, there was no eyewitness to the murder, the defendant did not confess, the victim disappeared, and no murder weapon was found. *Nisbett*, 552 S.W.3d at 262. In each case, the defendant and victim had a troubled marital relationship headed for divorce, the defendant had a history of abusive and violent behavior toward the victim, the day the victim disappeared involved suspicious events, the victim's activity or lack of activity on that date was out-of-character and out of line with intentions and goals expressed earlier, and the husband expressed animus about the victim before the victim disappeared and made suspicious and inconsistent statements after her disappearance. *Id.* Additionally, each defendant attributed statements to the victim that the victim did not make and used an account owned by the victim to pay for something after the victim disappeared. *Id.* Physical evidence supported the conclusions the victims were murdered, although the bodies were never found. *Id.* The court of criminal appeals concluded the evidence was sufficient to support both convictions. *Id.* at 268.

As in *Nisbett*, in the case before us, there were no eyewitnesses to the murder, appellant did not confess to murdering Jessie, and no murder weapon was found. However, the evidence shows Jessie and appellant were in a troubled romantic relationship, appellant physically abused Jessie, appellant controlled Jessie's relationships with her parents, Jessie's disappearance involved suspicious events, Jessie's lack of activity in the days following her disappearance was out-of-character, appellant engaged in suspicious behavior after Jessie disappeared, appellant made suspicious and inconsistent statements to the police, appellant dumped Jessie's body in a remote location, and appellant attributed statements to Jessie that she did not make. *See id.* Further, physical evidence supports the conclusion Jessie was murdered. *See id.* However, unlike in *Nisbett*, the police recovered Jessie's body and did so with appellant's assistance.

Although appellant argues there is no evidence of intent, there is ample circumstantial evidence from which the jury could have inferred the requisite intent. Evidence presented at trial shows appellant was angry at the time of Jessie's death because she "cheated" on him in December 2015. By his own admission, appellant is paranoid about his girlfriends cheating on him. He testified this was a problem in his relationship with Jessie, and that testimony is supported by his text messages from April 2016 stating: "It will take time for me to trust fully. . ."; "Don't ever touch another guy"; and "I don't trust you. That's your fault." Appellant testified he did not "ever really get over" his anger after learning that Jessie "hooked up" with another man before moving to Texas. He was still angry on April 30 when, in response to Jessie's text stating "Love you," he replied, "No you don't"; "I have to text just for you to talk b"; and "Fuck this." Regina Thomas testified Jessie was "kinda sad" on April 30 because appellant was mad about "something I did a long time ago and he can't get over it." After her death, appellant told Detective Hale that Jessie cheated on him, became pregnant, and had an abortion, indicating he continued ruminating on these events after her death. Despite appellant's jealousy and concerns about Jessie cheating, he used dating websites and exchanging sexually graphic messages, including photographs, with numerous women; appellant also spent the night with at least one of the women. He continued these activities after Jessie's death.

There is some evidence appellant physically abused Jessie, controlled her behavior, and sought to separate her from her family. When Thomas Jordan visited appellant at the jail, Thomas said "you should have called me before you ever laid a hand on that girl." Appellant replied: "That's not how it went . . . If I'd wanted, I would have. Like I had in the past." Gary testified he and Jessie enjoyed a very close relationship, but he struggled to contact her after she moved. Appellant only allowed Gary to contact Jessie on the prepaid phone and Gary believed appellant monitored Jessie's phone calls and text messages. Jessie's mother also testified to reduced

–24–

communication with her daughter after Jessie moved to Dallas. Although Jessie lived with appellant for only four months, "[i]t was like she was a different person."

The jury also heard appellant's statements to Thomas Jordan that he was guilty of something, which he defined as criminal negligence. Further, appellant told Thomas: "I fucked up and made a mistake," "I made my bed," and "I had to do it the right way. The only way to do it the right way and safely was the way I did it, unfortunately." When Thomas told appellant he needed "to stand up for what you did and take the punishment like a man," appellant did not deny he had done anything. Instead he agreed and stated: "Yeah, no. I'm going to. That was the plan all along."

From all of this evidence, a rational trier of fact could have concluded appellant planned to kill Jessie and executed that plan because he was angry and jealous, the relationship was contentious, he did not trust Jessie, and he could not forgive Jessie for cheating on him.

Although appellant argues there is no physical evidence of causation, "it need not necessarily be known what caused the victim's death. The cumulative force of all the incriminating circumstances can support a murder conviction even if the evidence did not prove the method of commission of the offense." *Nisbett*, 552 S.W.3d at 264 (internal quotation marks omitted). In this case, there is significant circumstantial evidence that appellant caused Jessie's death. Appellant was the last person to see Jessie alive and was with her when she died; he owned guns and ammunition; he told numerous conflicting and implausible stories to the police after Jessie disappeared; he repeatedly lied to her parents and the police about her whereabouts; he created strange text conversations using his and Jessie's phones; he called and emailed Jessie after her death; he had muddy boots and gloves inside of his muddy car; and his garage smelled like a dead body. Additionally, appellant knew where the body was buried because he concealed it on Guinn's property, but he only revealed this information after striking a deal to limit any potential

punishment arising from his offense. He told Thomas Jordan he was guilty of doing a criminal act. The medical examiner testified that when, as here, an area of tissue is missing from a corpse, she is concerned about an underlying injury because maggots, which were plentiful in and around Jessie's body, target an area of the body that is easy to enter. Thus, she testified, "whenever I see a decomposed body where I've got one part of the body more skeletonized and more decomposed than another part of the body, I'm always worried about some underlying injury." Salzberger also testified nothing about Jessie's body was consistent with a natural death and she believed Jessie died of homicidal violence.

Appellant asserts there is insufficient evidence of motive. Motive is not an element of murder, but rather a circumstance indicative of guilt. *See Temple*, 390 S.W.3d at 360 ("Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt."); *Moses v. State*, No. 05-16-01391-CR, 2018 WL 4042359, at *8 (Tex. App.—Dallas Aug. 23, 2018, pet. ref'd) (mem. op., not designated for publication). The State was not required to prove appellant's motive.

Finally, appellant asserts Guinn's involvement lends credibility to his testimony, "cuts against the State's contention that Lowe's behavior was his alone, and further strains the already tenuous conclusion of guilt." We disagree. There is no indication Guinn, not appellant, caused Jessie's death. Even appellant's testimony limits Guinn's involvement to helping manage or conceal Jessie's body after she died. Guinn's participation, if any, does not negate the State's evidence supporting appellant's guilt, and appellant does not cite any legal authority to support his argument to the contrary.

CONCLUSION

Having reviewed all the evidence in the light most favorable to the prosecution, we conclude any rational trier of fact could have found the essential elements of murder beyond a

reasonable doubt.  The evidence is sufficient to establish appellant murdered Jessie.  We overrule

appellant's sole issue and affirm the trial court's judgment.


                                               /Erin A. Nowell/
                                               ERIN A. NOWELL
                                               JUSTICE
Do Not Publish
TEX. R. APP. P. 47.2(b)
171148F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JASON MICHAEL LOWE, Appellant

No. 05-17-01148-CR   V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-82169-2016.
Opinion delivered by Justice Nowell.
Justices Myers and Osborne participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 9th day of August, 2019.